**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOSEPH SOLEMBRINO, | ) | |
| | ) | CASE NO.　　1:10-CV-01017 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff Joseph Solembrino (hereinafter "Plaintiff") challenges the final decision of the

Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Plaintiff's claim

for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental

Security Income ("SSI") under Title II and Title XVI of the Social Security Act ("Act"), 42

U.S.C. §§ 416(i), 423, 1381 *et seq*.  This matter is before the Court pursuant to 42 U.S.C. §

405(g) and the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is AFFIRMED.

**I.  Procedural History**

On July 10, 2007, Plaintiff filed an application for POD, DIB, and SSI alleging a

disability onset date of October 5, 2004, and claiming that he was disabled due to a number of

physical and mental impairments.  His application was denied both initially and upon reconsideration.  Plaintiff timely requested an administrative hearing.

On August 13, 2009, an Administrative Law Judge ("ALJ") held a hearing during which Plaintiff, represented by counsel, testified.  George Starosta testified as an impartial vocational expert ("VE").  On September 17, 2009, the ALJ found Plaintiff was able to perform a significant number of jobs in the national economy and, therefore, was not disabled.  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review.

## II.  Evidence

### Personal and Vocational Evidence

Age forty-seven (47) at the time of his administrative hearing, Plaintiff is a "younger" person under social security regulations.  *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c).  Plaintiff has a high school education and past relevant work as an executive chef, a machine inventory controller, and a plant manager.  (Tr. 19.)

### Relevant Medical Evidence

1.    *Physical Impairments*

On October 6, 2004, Vincent Trago, M.D., performed a computed tomography ("CT") scan of Plaintiff's lumbar spine without contrast, after Plaintiff reported a lifting injury the previous day.  (Tr. 144.)  The scan revealed "a central disc bulge at L3-4 for 6 mm, which narrows the AP dimension of the spinal canal to 7 mm."  *Id*.  Dr. Trago concluded that the disc bulge at L3-4 could represent a central herniation.  *Id*.

On December 8, 2004, an x-ray of Plaintiff's lumbosacral spine revealed no evidence of

acute fracture or dislocation.  (Tr. 146.)  The radiologist did note the presence of early

degenerative changes in the lumbar spine.  *Id.*

On February 23, 2005, Plaintiff underwent an MRI of the lumbar spine, which revealed

degenerative disc disease of the lower thoracic spine, L1-2 disc dehydration, L2-3 mild disc

bulge and foraminal narrowing, L3-4 disc dehydration and a 4 mm herniation with flattening of

the anterior thecal sac and bilateral foraminal narrowing, L4-5 disc dehydration with a 4-5 mm

herniation with flattening of the anterior thecal sac and bilateral foraminal narrowing, and mild

loss of disc space at L5-S1.  (Tr.145; 210.)

Between October of 2004, and August 6, 2007, Plaintiff was seen by John Paul, M.D., an

orthopedic surgeon on at least a monthly basis – sometimes as often as three times a month.  (Tr.

158-212.)  Dr. Paul found consistently that Plaintiff had bilaterally positive straight leg raise

testing and positive Laségue's sign.  (Tr. 182, 184, 186, 198, 200, 209, 210.)  He was also

diagnosed with disc herniation (Tr. 184, 186, 198, 200, 209) and radiculopathy.  (Tr. 200, 201,

209.)

On April 23, 2005, A.L. Itani, M.D., saw Plaintiff a second time and stated that he "told

the patient that if he is going to be completely disabled from disc pathology, he needs to have his

claims approved prior to subjecting him to disc replacement at L3-4 and L4-5."  (Tr. 207.)

In a letter dated November 9, 2005, David Demangone, M.D., a pain management

specialist, reported his findings to Dr. Paul.  (Tr. 148-49.)  Plaintiff told Dr. Demangone that he

had undergone some physical therapy, including aquatherapy, per Dr. Paul's instructions, which

yielded some temporary relief.  (Tr. 148.)  Based on the February 23, 2005 MRI, Dr. Demangone

diagnosed disc herniations at L3-4 and L4-5.  *Id*.  He noted that Plaintiff suffered from foraminal

stenosis, which was moderate to severe at right L-4, mild to moderate bilaterally at L-3, and mild

to moderate at left  L-4.  *Id*. On examination, he found Plaintiff had normal standing and sitting

posture, and no signs of inflammation, swelling, or atrophy in the lower back or right leg.  (Tr.

149.)  While Plaintiff had good lumbar range, it reproduced low back pain.  *Id*.  Plaintiff had

positive straight leg raise testing on the left side for low back pain and on the right side for

producing posterior right knee pain.  *Id*.  Plaintiff also had hypoesthesia in his entire left thigh

and, to a lesser extent, in his lower left leg.  *Id*.  Dr. Demangone recommended medrol dose

packs, epidural steroid injections, and, if the former was not helpful, nerve foramen blocks.  *Id*.

In the interim, he prescribed Percodan.  *Id*.

On June 13, 2006, Dr. Paul noted that "[t]his patient can be rehabilitated with active

physical therapy, work conditioning, and work hardening programs and be able to return to

work.  However, all the treatment modalities have been denied by the BWC.  I recommend

Ultram for pain and Soma for muscle relaxation."  (Tr. 187.)

On January 17, 2007, Plaintiff was seen by Salim Hayek, M.D., Ph.D.  (Tr. 152-53.)

Plaintiff rated his pain as a six on a ten point scale – eight on his worst days and four on his best

days.  (Tr. 152.)  Dr. Hayek noted that Plaintiff's medical care since his lifting injury "has not

been aggressive [enough] for him to return to a functioning status."  *Id*.  Dr. Hayek noted that the

treatment plans recommended by Plaintiff's other physicians were not carried out.  *Id*.  On

examination, Dr. Hayek noted that Plaintiff was obese, had normal range of motion in his spine,

and normal gait and heel-toe walk.  (Tr. 153.)  However, flexion and extension increased his pain

in his back and down his legs.  *Id*.  Plaintiff had minimal pain on Faber's test, but tested positive

for pain at ten degrees on straight leg raises in both the sitting and supine positions.  *Id*.  Dr.

4

Hayek diagnosed lumbar strain and lumbar radiculopathy, and recommended intensive medical management, prescribing Topamax, Fentanyl, Toradol, and Cymbalta.[1]  *Id.*

On April 4, 2007, Plaintiff had a follow-up visit with Dr. Hayek and Asim Khan, M.D. (Tr. 150-51.)  They noted that a review of twelve systems was significant for low back pain.  (Tr. 150.)  On examination, Plaintiff's lumbar range of motion was limited with flexion and extension causing pain in the back.  (Tr. 150-51.)  Straight leg testing was negative bilaterally. (Tr. 151.)  The physicians diagnosed lumbar sprain/strain, lumbar radiculopathy, and displaced lumbar intervertebral disk without myelopathy.  *Id.*  They recommended epidural steroid injections, but felt that relief may be short-lived.  *Id.*  They also recommended a diskogram for a more conclusive diagnosis, and found that Plaintiff had failed pain management and would not prescribe any further medications.  *Id.*

On October 26, 2007, Charles Derrow, M.D., completed a Physical Residual Functional Capacity Assessment.  (Tr. 236-43.)   Dr. Derrow opined that Plaintiff could: lift/carry twenty pounds occasionally and ten pounds frequently with unlimited ability push and/or pull within the range; stand and/or walk for about six hours per workday; sit for about six hours per workday; frequently climb ramps/stairs, kneel, and crawl; occasionally stoop and crouch; and, never climb ladders/ropes/scaffolds.  (Tr. 237-38.)  He found Plaintiff had no manipulative, visual, communicative, or environmental limitations.  (Tr. 239-40.)  On April 16, 2008, state agency reviewing physician Jeffrey Vasiloff, M.D., affirmed Dr. Derrow's findings.  (Tr. 245.)

On April 22, 2009, Plaintiff began treatment with Bruce Piszel, M.D.  (Tr. 275.)  On

---

[1]  Andrew Alshab, M.D., was also involved in the evaluation, examination, and treatment of Plaintiff and confirmed the findings and recommendations of Dr. Hayek.  (Tr. 153.)

examination, Plaintiff was found to have decreased range of motion in the lumbar spine, tenderness bilaterally in the lumbar spine, bilateral muscle spasms, and positive straight leg raise tests bilaterally. (Tr.276.) Dr. Piszel diagnosed neuritis – thoracic or lumbosacral – and lumbar spondylosis. (Tr. 277.) He prescribed Percocet and further recommended a series of epidural steroid injections. *Id*. Plaintiff received his first injection on May 1, 2009. (Tr. 280.)

On May 23, 2009, Plaintiff underwent another MRI of the lumbar spine. (Tr. 285.) The MRI revealed diffuse disk bulge at L3-L4 and L4-L5, with central protrusion at L3-L4 and central to right protrusion and extrusion at L4-L5. *Id*. The impression was L4-L5 disk disease. *Id*.

2.      *Mental Impairments*

On October 9, 2006, Plaintiff complained to Dr. Paul that he is markedly depressed. (Tr. 177.) Dr. Paul recommended that Plaintiff see a psychologist or psychiatrist. *Id*.

On September 24, 2007, psychologist Richard Halas, M.A., completed a psychological consultative examination at the request of State Agency. (Tr, 217-20.) Halas felt that Plaintiff tended to minimize and/or deny problems. (Tr. 217.) On examination, Plaintiff exhibited a flat, hesitant, tentative, and sullen presentation. *Id*. Halas noted Plaintiff had moderate levels of anxiety, but his presentation was not consistent with an anxiety disorder. (Tr. 218.) Plaintiff's overall presentation was also within normal limits and he did not exhibit any symptoms and/or characteristics consistent with thought disorder or psychotic or psychotic process. *Id*. Plaintiff was oriented to time, place, and person, his memory was intact, he was able to perform simple calculations quickly and accurately, and his intelligence was estimated as average. *Id*. Halas diagnosed depressive disorder not otherwise specified and polysubstance abuse, currently in

6

remission.  (Tr. 220.)  He ascribed Plaintiff a global assessment of functioning ("GAF") score of

45.[2]  *Id*.  Halas felt that Plaintiff was moderately limited in his ability to relate to others,

including peers, supervisors, and the general public, markedly limited in his ability to withstand

the stress and pressure associated with most day-to-day work, not limited in his ability to follow

through with simple one and two-step instructions and/or directions, and not limited in his ability

to perform simple, repetitive tasks.  *Id*.

On October 19, 2007, Joan Williams, Ph.D., completed a Psychiatric Review Technique

form.  (Tr. 221-35.)  Dr. Williams found that Plaintiff suffered from a medically determinable

impairment that does not satisfy any of the Listings – namely depressive disorder not otherwise

specified and polysubstance abuse currently in remission.  (Tr. 224; 229.)  Dr. Williams found

that Plaintiff had only mild limitations in activities of daily living, maintaining social

functioning, and maintaining concentration, persistence and pace.  (Tr.231.)  She reported that

Plaintiff had no episodes of decompensation of an extended duration.  *Id*.  Dr. Williams noted

that Plaintiff had "no current psych[iatric] treatment."  (Tr. 233.)  She further found that

Plaintiff's allegations were only partially credible and that a longitudinal pattern of severe or

substantial mental functional deficiency was not supported convincingly.  *Id*.

On October 26, 2009, Plaintiff began mental health treatment at Sarbot Singh Ajit,

M.D.'s office, and was seen by Barbara Padgett, MSW, LISW.  (Tr. 303.)  Plaintiff was

defensive, but verbalized well.  *Id*.  He was "somewhat resistant to the idea of continuing

---

[2] A GAF score between 41 and 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning.  A person who scores in this range may have suicidal ideation, severe obsessional rituals, no friends, and may be unable to keep a job.  *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. revised, 2000).

services, stating that he was only here at the request of his wife and his mother and that he is not crazy." *Id*.

On November 5, 2009, a week later, Dr. Ajit diagnosed a mood disorder due to general medical condition with a history of major depression.  (Tr. 318-19.)  Dr. Ajit ascribed Plaintiff a GAF score of 48 and increased Plaintiff's prescription for Celexa.  (Tr. 319.)

***Hearing Testimony***

At the hearing, Plaintiff testified to the following:

- He lives with his wife and step-children.  (Tr. 25-26.)  He has a driver's license and drives at least four times a week.  (Tr. 26.)

- He has an associate degree in culinary arts.  (Tr. 26.)

- On a typical day, he gets out of bed some time between 4:30 a.m. and 6:30 a.m. (Tr. 29.)  He checks his blood sugar and takes his medications.  *Id*.  The rest of the day he just "hangs around the house."  (Tr. 30.)

- He tries to help with chores, such as washing dishes, vacuuming, and mowing the lawn with a riding lawnmower.  (Tr. 30.)

- He does not engage in any social activities.  (Tr. 30.)

- He plays poker on the computer for six hours a day in one-hour increments.  (Tr. 31.)

- He does not require any assistance with bathing or dressing.  (Tr. 31.)

- He has difficulty sleeping, but does not use a sleeping aid because he gets nauseous.  (Tr. 31.)

- The primary reason he is unable to work is that he cannot lift anything heavy. (Tr. 32.)  He also cannot walk long distances or sit in one position for long.  *Id*. He also has trouble performing math in his head.  *Id*.

- He experiences pain in his left thigh, but does not take any medication for the pain.  (Tr. 33.)  Surgery is an option, but "nobody wants to do it because of [his] age."  *Id*.

- He has received one steroid injection in his back and was scheduled for another one around the time of the hearing.  (Tr. 34.)

- He has depression, but is not under any treatment because there is a waiting list for such doctors under State Medicaid.  (Tr. 33-34.)

The ALJ posed the following hypothetical to the VE:

I'm going to propose some hypothetical questions to you now.  For these I want you to assume you're dealing with an individual who is 47 years of age, has an Associate's degree and past work experience as described in the record.  For the first hypothetical, I want you to assume that this individual is capable of light exertion as defined by Social Security regulations with further restrictions in that he would be only occasionally able to bend, stoop or crouch and would need to periodically alternate between sitting and standing.  Would there be any jobs such an individual could perform?

(Tr. 36.)  The VE responded in the affirmative and identified the following jobs: cashier – light, unskilled; and, folder in a commercial laundry – light, unskilled.  (Tr. 36.)  The ALJ changed the hypothetical to no more than sedentary work and left all other limitations unchanged.  (Tr. 37.) In response, the VE identified the following jobs that such an individual could perform: surveillance system monitor – sedentary, unskilled; call-out operator – sedentary, unskilled; and, information clerk – sedentary, unskilled.  *Id*.  The ALJ then asked the VE if there were any jobs available where such person experienced moderate to severe pain causing him or her to be unable to maintain concentration or attend to tasks for prolonged periods.  *Id*.  The VE responded that there would be no jobs such an individual could perform.  *Id*.

### III.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[3]

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Plaintiff was insured on his alleged disability onset date, October 5, 2004, and remained insured through March 31, 2007. (Tr. 15.) Therefore, in order to be entitled to POD and DIB, Plaintiff must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

A claimant may also be entitled to receive SSI benefits when he establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

---

[3] The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity." Second, the claimant must suffer from a "severe impairment." A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

#### IV.  Summary of Commissioner's Decision

The ALJ found Plaintiff established medically determinable, severe impairments, due to

L3-4 and L4-5 herniation, obesity, and depression.  (Tr. 13.)  However, his impairments, either

singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P,

App. 1.  Plaintiff was found incapable of performing his past work activities, but was determined

to have a Residual Functional Capacity ("RFC") for a limited range of sedentary work.  The ALJ

then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to

determine that Plaintiff is not disabled.

#### V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the

record to support the ALJ's findings of fact and whether the correct legal standards were applied.

*See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed

if the administrative law judge's findings and inferences are reasonably drawn from the record or

supported by substantial evidence, even if that evidence could support a contrary decision.");

*Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been

defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular

conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than

a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v.

Perales*, 402 U.S. 389 (1971).

In addition to considering whether the Commissioner's decision was supported by

substantial evidence, the Court must consider whether the proper legal standard was applied.

Failure of the Commissioner to apply the correct legal standards as promulgated by the

regulations or failure to provide the reviewing court with a sufficient basis to determine that the

Commissioner applied the correct legal standards are grounds for reversal where such failure

prejudices a claimant on the merits or deprives a claimant of a substantial right. *See White v.*

*Comm'r of Soc. Sec.*, 572 F.3d 272 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742,

746 (6th Cir. 2006).

## VI.  Analysis

*Pain Analysis*

Plaintiff argues that the ALJ erred by failing to conduct a proper pain assessment.  (Pl.'s

Br. at 8-13.)  It is well settled that pain alone, if caused by a medical impairment, may be severe

enough to constitute a disability.  *See Kirk v. Sec' of Health and Human Servs.*, 667 F.2d 524,

538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).  When a claimant alleges symptoms of

disabling severity, the ALJ must follow a two-step analysis.  First, the ALJ must determine if

there is an underlying medically determinable physical or mental impairment.  Second, the ALJ

"must evaluate the intensity, persistence, and limiting effects of the symptoms."  SSR 96-7p.

Essentially, the same test applies where the alleged symptom is pain, as the Commissioner must

(1) examine whether there is objective medical evidence of an underlying medical condition.  If

there is, then the Commissioner must examine whether (2)(a) the objective medical evidence

confirms the alleged severity of pain, *or* (2)(b) whether the objectively established medical

condition is of such a severity that it can reasonably be expected to produce the alleged disabling

pain.  *See Felisky v. Bowen,* 35 F.3d 1027, 1038-39 (6th Cir. 1994); *Duncan v. Sec'y of Health &*

*Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986).

It is evident that the ALJ accepted that Plaintiff suffered from an underlying medical

condition that "could reasonably be expected to cause the alleged symptoms" – namely pain. (Tr. 16.)  However, the ALJ found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent they are inconsistent with [his RFC] assessment." (Tr. 16-17.)  Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987).  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for the weight."  SSR 96-7p; *see also Felisky,* 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so"); *Cross,* 373 F. Supp. 2d at 733 (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")  To determine credibility, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence in the record. *See* SSR 96-7p.  Beyond medical evidence, there are seven factors that the ALJ should consider.[4]

---

[4] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other

The ALJ set forth the following reasons for not accepting the severity of the symptoms as alleged by Plaintiff:

- Though Plaintiff reported his pain was between eight and ten on a scale of one to ten throughout 2007, in 2009 he told his doctor that his pain was between four and seven.  (Tr. 17.)

- Despite allegations of extreme pain, Plaintiff received relatively conservative treatment.  (Tr. 17-18.)  Though he tried several prescription medications, he discontinued them after experiencing side effects.  (Tr. 17.)

- It has been recommended that Plaintiff undergo surgery, but he has refused.  (Tr. 17-18.)

- The limiting effects of Plaintiff's back and leg pain are not supported by his activities of daily living such as preparing complete meals, driving, shopping for groceries, mowing the lawn, doing light house work, and playing online poker for up to six hours a day.  (Tr. 17-18.)

- He is able to ambulate with a normal gait without an assistive device.  (Tr. 17.)

Plaintiff contends that the ALJ erred in his pain assessment by selectively relying on evidence that supported the decision while ignoring contrary evidence.  The Court disagrees. First, it bears pointing out that the ALJ did *not* find Plaintiff's allegations entirely incredible. The ultimate RFC finding was rather restrictive, as it limited Plaintiff to a range of unskilled, sedentary work with a sit/stand option and other postural restrictions.  (Tr. 16.)  In addition, the ALJ actually found that Plaintiff was more severely limited than determined by state agency physicians Dr. Derrow and Dr. Vasiloff, ascribing their opinions only moderate weight.  (Tr. 18.)

------

than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  SSR 96-7p, Introduction; *see also Cross v. Comm'r of Soc. Sec.*, 375 F. Supp. 2d 724, 732 (N.D. Ohio 2005).

14

Moreover, the ALJ's credibility determination, which is entitled to considerable deference, comported with the requirements of SSR 96-7p.  Among the seven factors listed, the ALJ specifically discussed Plaintiff's daily activities, the intensity of the Plaintiff's pain, the medications used by Plaintiff, and treatment, other than medication, Plaintiff received or that is available to him.  An ALJ need not analyze all seven factors, but should show that he considered the relevant evidence.  *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005); *Masch v. Barnhart*, 406 F. Supp.2d 1038, 1046 (E.D. Wis. 2005).  Though a more thorough discussion of the efficacy of Plaintiff's pain medications would have been beneficial, the Court declines to find that the ALJ's pain assessment and credibility analysis were insufficient or procedurally improper.

Plaintiff challenges the ALJ's conclusions and argues that the evidence was misconstrued.  Specifically, Plaintiff takes issue with the ALJ's discussion of his daily activities relying upon a functional report completed by Plaintiff's mother.  (Pl.'s Br. at 11-12, *citing* Exh. 6E.)  Plaintiff alleges that the ALJ "cherry picked" the evidence.  *Id*.  The ALJ's discussion of the evidence therein is reasonably thorough and accurate.  (Tr. 17.)  Admittedly, the ALJ did not specifically mention that portion of the mother's statement where she indicated that Plaintiff must regularly change positions to avoid discomfort.  (Tr. 18.)  The ALJ did, however, accommodate this limitation by including a sit/stand option, which he expressly based on the mother's statement.  *Id*.

Furthermore, this Court cannot conduct a *de novo* review.  The findings of the ALJ are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen*, 800

15

F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the [ALJ] must stand if the evidence could reasonably support the conclusion reached.  *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).  The ALJ's conclusions were not unreasonable.  It is not uncommon in disability cases for there to be some inconsistencies in the record.  It is the duty of the ALJ to resolve any inconsistencies in the evidence.  *See, e.g., Bond v. Astrue*, 2009 U.S. Dist. LEXIS 124539 (E.D. La. Oct. 5, 2009); SSR 96-8p, 1996 SSR LEXIS 5 ("In all cases in which symptoms, such as pain, are alleged, the RFC assessment must ... [i]nclude a resolution of any inconsistencies in the evidence as a whole.")  As such, an ALJ does not "cherry pick" the evidence merely by resolving some inconsistencies unfavorably to a claimant's position.

Therefore, Plaintiff's first assignment of error is without merit.

### *Consultative Examination/Medical Expert*

Next, Plaintiff argues that the ALJ erred by failing to call a medical expert ("ME") or order a consultative examination.  (Pl.'s Br. at 12-13.)  Specifically, Plaintiff asserts that there was no additional review performed after 2007, and that it was error for the ALJ not to call an ME or order a new consultative examination.  *Id*.

Plaintiff cites no rule or regulation that requires an ALJ to order such a review.  In fact, "20 C.F.R. §§ 404.1527(f)(2)(iii) and 416.927(f)(2)(iii) provide discretion rather than a mandate to the ALJ to decide whether to solicit medical expert testimony, stating that ALJs 'may . . . ask

for and consider opinions from medical experts on the nature and severity of [a claimant's] impairment(s) ...." *Simpson v. Comm'r of Soc. Sec.*, 2009 U.S. App. LEXIS 19206 (6th Cir. Aug. 27, 2009) (*citing Davis v. Chater*, 1996 U.S. App. LEXIS 33614, at *6 (6th Cir. Dec. 19, 1996)); *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) *citing* 20 C.F.R. §§ 404.1517, 416.917 ("If your medical sources cannot or will not give us sufficient medical evidence about your impairment for us to determine whether you are disabled or blind, we *may* ask you to have one or more physical or mental examinations or tests.") (emphasis added); *see also Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("The regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination.").

As such, the ALJ did not commit error by declining to order a consultative examination or to solicit the testimony of an ME.

***Mental Limitations***

Finally, Plaintiff argues that the ALJ did not properly assess his psychological disorder and resultant mental limitations by failing to accord proper weight to his treating mental physician, Dr. Ajit.  (Pl.'s Br. At 14-15.)  Plaintiff, however, cites a medical report from Dr. Ajit dated November 5, 2009 – almost two months after the ALJ's Decision.  (Pl.'s Br. at 14-15; Tr. 318-19.)  As the ALJ could not have considered this report, it is not relevant for the purposes of this Court's ruling.  It is inherently unreasonable for Plaintiff to assert that the ALJ did not accord proper weight to the opinion of a source who had not started treating a claimant until after

the decision was issued.[5]  Plaintiff also argues that Dr. Ajit's opinion is consistent with state

agency examiner Halas.  *Id*.  Assuming this statement to be true, the ALJ,

nonetheless, could not have considered a record produced after the decision.  Moreover, it is

undisputed that Halas was not a treating source.  Therefore, his opinion is not entitled to the

same deference as a treating physician, psychiatrist, or psychologist.

A court can, however, remand a case for consideration of evidence that post-dates the

ALJ's decision where there is a showing that the evidence is new and material, and there is good

cause for the failure to include it in the prior proceeding.  *See* 42 U.S.C. § 405(g); *Casey v. Sec'y*

*of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993).  Evidence is considered new if it

was "not in existence or available to the claimant at the time of the administrative hearing."

*Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990).  Furthermore, in this circuit, evidence or a

report simply dated after the ALJ's decision does not satisfy the good cause requirement.  The

claimant must also provide a valid reason for his or her failure to obtain that evidence before the

hearing date.  *See Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d. 964, 966 (6th Cir. 1986);

*accord Merida v. Astrue*, 2010 U.S. Dist. LEXIS 91500 (E.D. Ky. Aug. 30, 2010) (noting that

the Sixth Circuit "takes a hard line on the good cause test" and that medical reports post-dating

the Commissioner's final decision do not demonstrate good cause) (citations omitted).  Here,

Plaintiff has failed to offer any reason for not obtaining the evidence earlier.  As such, this

assignment of error is without merit.

---

[5]  Plaintiff's brief concedes that Dr. Ajit first saw Plaintiff no earlier than October 26, 2009.
(Pl.'s Br. at 6.)

### VII.  Decision

For the foregoing reasons, the decision of the Commissioner is AFFIRMED and judgment is entered in favor of the defendant.

IT IS SO ORDERED.

s/ Greg White
U.S. Magistrate Judge

Date: May 27, 2011